**STATE v. JORDAN**

[130 N.C. App. 236 (1998)]

---

STATE OF NORTH CAROLINA v. DWIGHT JAMAAL JORDAN

No. COA97-1057

(Filed 21 July 1998)

### 1. Evidence— statement against interest—excluded

There was no prejudicial error in a prosecution for first-degree murder and attempted armed robbery in the exclusion of a witness's statement to a private investigator where the witness would not testify and defendant contended that it was a statement against interest. Assuming that the statement was against the declarant's penal interest and that corroborating circumstances clearly indicated the trustworthiness of the statement, the value of the statement in corroboration of defendant's version of the shooting was minimal.

### 2. Evidence— homicide victim's violent character—exclusion—no prejudice

There was no prejudicial error in a prosecution for first-degree murder and attempted armed robbery in the initial ex-

clusion of evidence of the victim's violent character because defendant was subsequently allowed to introduce evidence that the victim was a violent person.

**3. Evidence— homicide victim's violent character—psychological evaluation**

There was no error in a prosecution for first-degree murder and attempted armed robbery in the exclusion of a psychological evaluation of the victim. Although the testimony arguably tended to show the victim's general bad character, it was not relevant on the issue of his character for violence.

**4. Homicide— self-defense—instructions**

There was no prejudicial error in a prosecution for first-degree murder in which defendant claimed self-defense where the trial court did not instruct the jury on evidence presented by the defendant that he was aware of specific incidents of the victim's violent behavior. The trial court correctly instructed on self-defense and, even if the court erred in failing to include the instructions on specific incidents of violent behavior, there was no reasonable possibility that a different result would have been reached without the error.

**5. Homicide— defense of third party—no instruction**

The trial court did not err in a first-degree murder prosecution by failing to give an instruction on the defense of a third party where the evidence did not support defendant's request.

Appeal by defendant from judgments entered 29 August 1996 by Judge David Q. LaBarre in Wake County Superior Court. Heard in the Court of Appeals 30 April 1998.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Francis W. Crawley, for the State.*

*J. Lee Carlton, Jr. for defendant-appellant.*

WALKER, Judge.

Defendant was convicted of first-degree murder and attempted robbery with a dangerous weapon. He was subsequently sentenced to life imprisonment without parole on the murder conviction and to a consecutive prison term of not less than 66 months and not greater than 89 months for the attempted robbery conviction.

The State's evidence at trial tended to show the following: On the evening of 4 March 1995, Aaron Poole (the victim) was in his apartment on Hawkins Street in Raleigh with his younger brother, Lamont Gurley (Gurley), and a friend, Jeremiah Cannon (Cannon). The victim's mother (Mrs. Parker) had recently left the apartment with the victim's daughter to pick up the victim's girlfriend (and mother of the child) at the movies.

Gurley testified that someone knocked on the door, Cannon answered the door, and the defendant entered the apartment. The defendant then talked with the victim and went into the kitchen with the victim to get a drink of water. Cannon testified that when the defendant and the victim came back into the living room, the defendant pulled out a gun and told the victim to give him some money. Cannon also stated that the victim acted as if the defendant were joking and inquired of the defendant where he, the victim, could obtain a pistol. The defendant then left the apartment but indicated that he would return.

Cannon warned the victim that the defendant could have robbed them. The victim, who had been counting money in the living room before the defendant had arrived, then hid his money. Approximately ten minutes later, the defendant returned to the apartment and pulled out his gun as he entered. A second male then entered the apartment with a rifle and pointed it at Cannon while the defendant hit the victim three or four times on the head with his gun.

The defendant pulled the victim into a bedroom and ordered him to turn over the money. When the defendant and the victim returned to the living room, the victim said that he heard his mother's vehicle pulling up out front. The defendant, the second male and the victim ran into the kitchen to the back door. Gurley and Cannon ran out the front door and heard several gunshots. A few moments later the victim ran out the front door.

Mrs. Parker was getting out of her van when she saw the three coming out the front door. They all got in the van, the victim said he had been shot and they drove to Wake Medical Center's emergency room. The victim died during the early morning hours on 5 March 1995 due to bleeding from injuries to his internal organs caused by the gunshot wounds he received.

Officer D.C. McNeill of the Raleigh Police Department testified that he responded to a call at Wake Medical Center on 5 March

1995 and spoke with the victim before his death. The victim told McNeill that he was shot at his apartment on Hawkins Street. He stated to McNeill that, "Dwight Jordan shot me . . . for my money, no, for my bracelet . . . He took my money . . . my tax money . . . He robbed me . . . ." The victim also told McNeill that he had bought marijuana from the defendant before he was shot.

McNeill and other officers went to the Hawkins Street apartment and found three bullet casings in the kitchen and one in the living room, as well as two bullet holes in the walls of the living room and one in the window in the living room. A bullet hole was also found in the window of a church van that was parked in front of the apartment at the time of the shooting. From the locations of the bullet holes, it appeared as though the gunshots were fired from the kitchen area toward the front door. The dresser drawers in Mrs. Parker's bedroom had been pulled open and ransacked.

The four shell casings were examined by an expert with the State Bureau of Investigation who formed the opinion that two bullets were fired by the same gun and the other two bullets were fired by a different gun.

The defendant testified to the following: The defendant first met the victim in high school and they both had been in the Wake County Jail in 1994. The victim had told the defendant he was in jail because he beat up and stabbed a person named Marvin Stancil. On 4 March 1995, the defendant babysat his daughter and spent time with his girlfriend from 3:00 p.m. until 11:00 p.m. When the defendant's mother came home around 11:45 p.m., the defendant, his friend Billy Yates, his brother Cortney Cheek (Cheek) and Bacarius Wilson drove to the victim's apartment to buy marijuana.

Upon arriving at the apartment, the defendant and Cheek went inside where the defendant gave the victim $40.00 for a quarter ounce of marijuana. The victim got up and went to the back room. He then returned to the living room, pulled down the blinds, said his mother was coming and told the defendant and Cheek to go out the back door. The defendant and Cheek walked to the back door and the defendant heard a "chi-chi" sound like a bullet going into a chamber. The defendant let go of the door, pulled out his gun, stepped away from the door and moved beside the refrigerator. The defendant then heard a running sound on the wood floors of the apartment and saw the victim come into the kitchen with a gun in his hand hanging down by his side.

Cheek tried unsuccessfully to get the back door open and the defendant fired his gun twice. After the first shot, the victim said, "Oh, s——" and turned around to leave the kitchen. The defendant shot again and ran to the back door. He then heard two more shots fired by Cheek. Defendant unlocked the door and he and Cheek ran to the car. The defendant testified that he never intended to rob the victim or anyone else at the apartment, he did not take anything from the apartment, and that he only fired his gun because he thought the victim was going to shoot or rob Cheek and him.

The defendant's mother testified that she spoke with the defendant on the telephone on 5 March 1995 while the detectives were at her apartment and that the defendant told her it was self-defense.

Shortly after the victim's death, Cheek told detectives that he was not with the defendant the night in question as he had gone elsewhere to drink alcohol and smoke marijuana. He also told detectives that he spoke with the defendant on the telephone the day after the incident and that the defendant told him what had happened and that he had gotten rid of the gun. Later, when Cheek was in the Wake County Jail in connection with this case, Detective Branch asked Cheek for a statement which he declined to give. At trial, Cheek exercised his constitutional right not to testify about the events which occurred the night of the murder.

The defendant offered the testimony of Mel Palmer, a private investigator, and Julia Stockton, a school psychologist. However, the trial court did not allow this evidence. Palmer did testify that he interviewed Cheek on 26 July 1996 and that Cheek made a statement.

[1] The defendant first argues that the trial court erred in excluding the statement that Cheek gave to the private investigator as it was a statement against interest and he was an unavailable witness. The statement Cheek gave to the private investigator tended to corroborate the defendant's version of the events occurring on the evening of 4 March 1995, although Cheek did not mention seeing a gun in the victim's hand as he came into the kitchen.

We first note that, by exercising his right not to testify, Cheek was an unavailable witness under the meaning of N.C. Gen. Stat. § 8C-1, Rule 804. Pursuant to N.C. Gen. Stat. § 8C-1, Rule 804 (b)(3) (1992), when a declarant is unavailable, a statement against interest is generally not excluded by the hearsay rule. The statute provides as follows:

STATE v. JORDAN

[130 N.C. App. 236 (1998)]

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances indicate the trustworthiness of the statement.

This rule requires a two-prong test. First, the trial court must be satisfied that the statement is against the declarant's penal interest. Second, corroborating circumstances must clearly indicate the trustworthiness of the statement. *State v. Wilson*, 322 N.C. 117, 134, 367 S.E.2d 589, 599 (1988).

Assuming that Cheek's statement met the requirements of the two-prong test and should have been admitted, in order for the defendant to be entitled to a new trial, he must show that the error in excluding the statement prejudiced him to the extent that had the error not been committed, a different result would have been reached at trial. N.C. Gen. Stat. § 15A-1443(a) (1997).

The defendant sought admission of Cheek's statement for the purposes of corroborating his version of the shooting and specifically to support his theory of self-defense. Although Cheek, in his statement, indicated that he heard a pistol cock as he entered the kitchen, he did not mention the victim entering the kitchen with a gun in his hand. Moreover, the defendant admitted that he fired his gun toward the victim as the victim entered the kitchen and before any gun was pointed at him or before any threatening words were directed toward him. Thus, the value of Cheek's statement as corroboration of the defendant's version that he shot the victim in self-defense is minimal and we cannot conclude that if admitted, the statement would have resulted in a different outcome at trial.

[2] Defendant next argues that the trial court erred in excluding evidence of the victim's violent character as such evidence is admissible where the defendant claims he acted in self-defense. Moreover, the defendant argues the trial court erred in failing to instruct the jury on the victim's violent character as it related to his defense of self-defense.

Our Supreme Court in *State v. Watson*, 338 N.C. 168, 449 S.E.2d 694 (1994) stated:

Where an accused argues that he acted under self-defense, the victim's character may be admissible for two reasons: to show defendant's fear or apprehension was reasonable or to show the victim was the aggressor. Defendant may admit evidence of the victim's character to prove defendant's fear or apprehension was reasonable and, as a result, his belief in the need to kill to prevent death or imminent bodily harm was also reasonable. Such evidence may be proved by opinion testimony . . . . 'The purpose of such evidence is not to prove conduct by the victim, but to prove defendant's state of mind.' Such an opinion is relevant on the issue of defendant's state of mind only to the extent that defendant has knowledge of this opinion. When defendant knows of the violent character of the victim, such evidence is relevant and admissible to show the jury that defendant's apprehension of death and bodily harm was reasonable . . . .Evidence of the victim's character may also be admissible 'because it tends to shed some light upon who was the aggressor since a violent man is more likely to be the aggressor than is a peaceable man.' Defendant, to prove that the victim was the aggressor, may present evidence of the victim's violent character, 'whether known or unknown to the defendant at the time of the crime.'

*Id.* at 187-88, 449 S.E.2d at 706 (citations omitted).

In making his argument, defendant contends that it was error for the trial court to exclude evidence of defendant's knowledge of the victim's reputation for violence. At the outset of the defendant's testimony, he was asked about the victim's reputation for violence. The trial court sustained the State's objection to this question. However, later in the defendant's direct examination, the following exchange took place without objection:

Counsel: What happened then?

Defendant: That's when I heard the running on the floor, because they've got the wood floors in the apartment, so you can hear the running. If somebody's jogging, you can hear it. So I heard the running coming from the living room. When I looked around the corner, I seen Poole [the victim] coming into the kitchen with his pistol hanging probably hanging right above his knee. So that's when I just came out. See, he couldn't see me once he came in because it was the side of the refrigerator. So as soon as he stepped above that, that's when I came out at maybe a diagonal shape.

STATE v. JORDAN

[130 N.C. App. 236 (1998)]

Counsel: Now have a seat for a minute. Prior to that instant, did you know what Aaron Thomas Poole's [the victim] reputation in the community was for violence or peaceableness of character?

Defendant: I knew— basically I knew about fights and, you know, drug dealing. And basically that was it. I never—I never known him to shoot nobody. I known him to stab somebody, but not shoot anybody.

Counsel: What did you know of his character from— for violence from your own observation of him?

Defendant: I seen him fight some dudes at Enloe one day walking down the breezeway, him and Bobby Clack and another dude named Greg, Greg Kennedy.

Although the defendant's answers to the questions were not evidence of the victim's reputation for violence, they were evidence of specific acts of violence by the victim of which the defendant had knowledge. This type of evidence is admissible for the purpose of "explaining and establishing defendant's reasonable apprehension" of the victim. *See State v. Mize*, 19 N.C. App. 663, 665, 199 S.E.2d 729, 730 (1973). Therefore, as the defendant was allowed to introduce evidence that the victim was a violent person, he was not prejudiced by the trial court initially sustaining the State's objection. *See State v. Anderson*, 26 N.C. App. 422, 216 S.E.2d 166, *disc. review denied*, 288 N.C. 243, 217 S.E.2d 667, (1975) (Exclusion of evidence cannot be prejudicial when the witness later testifies to the same facts or the evidence is merely cumulative of other testimony).

[3] The defendant also argues that the psychological evaluation of the victim by Julia Stockton was improperly excluded. The evaluation contained the following reasons that the victim was referred to the school psychologist: poor self-concept, disruptive and immature behaviors, provokes and aggravates others, blames others, poor peer relationships, consistent inappropriate emotional responses, and most pronounced, lying and making excuses. Although this testimony arguably may tend to show the victim's general bad character, we fail to see how this testimony is relevant on the issue of the victim's character for violence. *See State v. Anderson*, 26 N.C. App. 422, 216 S.E.2d 166 (1975) (Where proffered testimony is entirely unrelated to character for violence, it is inadmissible). Thus, the trial court did not err in excluding Ms. Stockton's evaluation.

Any additional evidence from the defendant of the victim's character for violence, which was not admitted at trial, is not included in the record and "we cannot assess the significance of [other] evidence sought to be solicited." *See Watson,* 338 N.C. at 188, 449 S.E.2d at 706 (1994).

**[4]** Included in this assignment of error, is the defendant's argument that the trial court erred in its instructions on self-defense when it failed to instruct the jury how to consider the evidence of the victim's violent character in determining whether the defendant's apprehension of death or bodily harm was reasonable.

This issue was examined by this Court in *State v. Powell,* 51 N.C. App. 224, 275 S.E.2d 528 (1981). In *Powell,* the Court stated:

In prosecutions for homicide and assault, where the defendant pleads and offers evidence of self-defense, evidence of the character of the victim as a violent and dangerous fighting man is admissible if such character was known to the defendant . . . . It is also true that when such evidence is introduced by the defendant, the court, even in the absence of a request, should instruct the jury as to the bearing which this evidence might have on defendant's reasonable apprehension of death or great bodily harm from the attack to which his evidence pointed.

*Id.* at 226, 275 S.E.2d at 530 (citations omitted).

The Court in *Powell* held that it was error for the trial court not to have instructed on the evidence of the victim's previous assaults on the defendant which indicated that the victim was a dangerous and violent man. *Id.* at 227, 275 S.E.2d at 531. However, the Court ultimately concluded that where the instructions on self-defense were otherwise complete, this error standing alone did not constitute reversible error. *Id.* at 228, 275 S.E.2d at 531. *See also State v. Rummage,* 280 N.C. 51, 185 S.E.2d 221 (1971).

Here, the trial court's instructions on self-defense, which were substantially similar to those given by the trial court in *Powell,* are as follows:

The defendant would be excused . . . on the ground of self-defense, if first it appeared to the defendant and he believed it to be necessary to kill the victim in order to save himself from death or great bodily harm. And second, the circumstances as they appeared to the defendant at the time were sufficient to create a

belief in the mind of a person of ordinary firmness. It is for you, the jury, to determine the reasonableness of the defendant's belief in the circumstances as they appeared to him at the time. In making this determination, you should consider the circumstances as you find them to be, you find them to have existed from the evidence, including the size, age and strength of the defendant as compared to the victim; the fierceness of the assault, if any, upon the defendant; whether or not the victim had a weapon in his hand. The defendant would not be guilty of any murder . . . if he acted in self-defense, as I've just defined it to you, and if he was not the aggressor in bringing on the fight and did not use excessive force under the circumstances . . . . It is for you, the jury, to determine the reasonableness of the force used by the defendant under all the circumstances as they appeared to him at the time.

Thus, the trial court correctly instructed on self-defense as to the charge of first-degree murder. These instructions were repeated in connection with the lesser-included offenses of second-degree murder and voluntary manslaughter.

As in *Powell*, we conclude that even if the trial court erred in failing to include instructions on the evidence presented by the defendant that he was aware of specific incidents of the victim's violent behavior, we do not believe there is a reasonable possibility that a different result would have been reached at trial had the error not occurred.

[5] Lastly, the defendant argues that the trial court erred by failing to give an instruction on defense of a third party (Cheek) as requested by the defendant. We have carefully considered this assignment of error and find it to be without merit as the evidence presented does not support the request.

In summary, we find the defendant received a fair trial free of prejudicial error.

No error.

Judges WYNN and MARTIN, John C., concur.